**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DR. RAHINAH IBRAHIM, an individual,<br><br>*Plaintiff-Appellant*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; JEH JOHNSON,<sup>*</sup> in his official capacity as the Secretary of the Department of Homeland Security; TERRORIST SCREENING CENTER; CHRISTOPHER M. PIEHOTA, in his official capacity as Director of the Terrorist Screening Center; FEDERAL BUREAU OF INVESTIGATION; JAMES COMEY, in his official capacity as Director of the Federal Bureau of Investigation; LORETTA E. LYNCH, Attorney General, in her official capacity as Attorney General; ANDREW G. MCCABE, in his official capacity as Executive Assistant Director of the FBI's National Security Branch; NATIONAL COUNTERTERRORISM | Nos. 14-16161<br>14-17272<br><br>D.C. No.<br>3:06-cv-545-WHA<br><br><br>OPINION |

---

<sup>*</sup> Current cabinet members and other federal officials have been substituted for their predecessors pursuant to Rule 43(c)(2) of the Federal Rules of Appellate Procedure.

CENTER; NICHOLAS RASMUSSEN, in
his official capacity as Director of
the National Counterterrorism
Center; DEPARTMENT OF STATE;
JOHN KERRY, in his official capacity
as Secretary of State; UNITED STATES
OF AMERICA,

*Defendant-Appellees.*

Appeal from the United States District Court
for the Northern District of California
William Alsup, District Judge, Presiding

Argued and Submitted June 14, 2016
San Francisco, California

Filed August 30, 2016

Before: Richard R. Clifton and Sandra S. Ikuta, Circuit
Judges, and Royce C. Lamberth,** Senior District Judge.

Opinion by Judge Lamberth

---

** The Honorable Royce C. Lamberth, Senior District Judge for the U.S.
District Court for the District of Columbia, sitting by designation.

## SUMMARY***

### Equal Access to Justice Act

The panel affirmed in part and reversed in part the district court's award of attorney's fees and expenses pursuant to the Equal Access to Justice Act ("EAJA") and the Supreme Court's decision in *Hensley v. Eckerhart*, 461 U.S. 424 (1983), and remanded for further proceedings.

Dr. Rahinah Ibrahim commenced the underlying action seeking monetary and equitable relief against various state and federal officials based on her inclusion in the government's terrorist databases, including the No-Fly List. After two dismissals and subsequent reversals and remands by this court, the district court held a week-long bench trial and concluded that Ibrahim had been improperly placed within the government's databases. Ibrahim sought $3,360,057 in market-rate attorney's fees and $293,860 in expenses.

The district court determined that Ibrahim was a prevailing party under EAJA, but further found that the government was substantially justified in some of its positions. The district court awarded Ibrahim $419,987.36 in fees and $34,768.71 in costs and expenses.

In light of the Supreme Court's decision in *Commissioner, INS v. Jean*, 496 U.S. 154 (1990) (providing that courts are to make but one substantial justification determination on the case as a whole), the panel held that the

---

*** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

district court erred by making multiple substantial justification determinations and accordingly reversed. The panel also reversed the district court's various reductions imposed on Ibrahim's eligible fees arising from its incorrect substantial justification analysis. The panel affirmed the district court's bad faith findings as well as its relatedness findings under *Hensley* . The panel also affirmed the district court's striking of Ibrahim's objections to the special master's report on expenses.

## COUNSEL

Marwa Elzankaly (argued), Jennifer Murakami, Ruby Kazi, Christine Peek, Elizabeth Pipkin, and James McManis, McManis Faulkner, San Jose, California, for Plaintiff-Appellant.

Joshua Waldman (argued) and Sharon Swingle, Attorneys, Appellate Staff; Melinda Haag, United States Attorney; Benjamin C. Mizer, Principal Deputy Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C., for Defendants-Appellees.

Chet A. Kronenberg and JoAnne S. Jennings, Simpson Thacher & Bartlett LLP, Los Angeles, California, for Amici Curiae American Civil Liberties Union of California, Asian Americans Advancing Justice-Asian Law Caucus, Asian Americans Advancing Justice-Los Angeles, Center for Constitutional Rights, Electronic Frontier Foundation, and National Immigration Law Center.

## OPINION

LAMBERTH, Senior District Judge:

Plaintiff-Appellant Dr. Rahinah Ibrahim appeals the district court's award of attorney's fees and expenses pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412 and the Supreme Court's decision in *Hensley v. Eckerhart*, 461 U.S. 424 (1983). She contends the district court incorrectly found that the government had not acted in bad faith under EAJA section 2412(b) and therefore erred by declining to award market-rate fees. She further argues the district court erred by finding that the government's conduct was substantially justified under EAJA section 2412(d)(1)(A) on discrete issues and at discrete stages of the litigation, rather than making a single determination on the case as a whole. Finally, she challenges the district court's striking of her objections to a special master's report on her claimed expenses. We have jurisdiction under 28 U.S.C. § 1291.

In light of the Supreme Court's decision in *Commissioner, INS v. Jean*, 496 U.S. 154 (1990), we hold the district court erred by making multiple substantial justification determinations and accordingly reverse. We also reverse the district court's various reductions imposed on Ibrahim's eligible fees arising from its incorrect substantial justification analysis.

We however affirm the district court's bad faith findings as well as its relatedness findings under *Hensley v. Eckerhart*, 461 U.S. 424 (1983). We also affirm the district court's striking of Ibrahim's objections to the special master's report on expenses.

## I.

Fee disputes, the Supreme Court has warned, "should not result in a second major litigation." *Hensley*, 461 U.S. at 437. But, unsurprisingly, they sometimes do, and the instant case is one such example.

In January 2006, Ibrahim commenced this action seeking monetary and equitable relief against various state and federal officials alleging 42 U.S.C. § 1983 claims, state law tort claims, and constitutional claims based on her inclusion in the government's terrorist databases, including the No-Fly List. After two dismissals and subsequent reversals and remands by this Court, *Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250 (9th Cir. 2008) ("*Ibrahim I*"), *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983 (9th Cir. 2012) ("*Ibrahim II*"), the district court held a week-long bench trial.[1]

The district court concluded that Ibrahim had been improperly placed within the government's databases.[2] Specifically, it found the FBI agent who nominated Ibrahim to the government watchlists incorrectly filled out the nomination form. As a result, Ibrahim was placed on the No-Fly List and another terrorist screening watchlist, rather than the lists on which the FBI agent had intended she be placed. *Id.* Accordingly, the court below ruled in favor of Ibrahim

---

[1] At the time of trial, the only remaining claims were those against the federal defendants arising from their placement of Ibrahim on the government's terrorism watchlists, as well as their revocation and subsequent denial of Ibrahim's entry visas.

[2] The district court's factual findings are not challenged on appeal; unless otherwise noted, factual assertions contained herein reflect those findings.

on her procedural due process claim, concluding the government's nomination error involved a "conceded, proven, undeniable, and serious error by the government." Although Ibrahim had been removed from the No-Fly List in early 2005, the government was ordered to remove any information contained in its databases associated with the 2004 nomination form, including those databases the FBI agent had intended Ibrahim be placed on, because the nomination form had been incorrectly filled out. It also ordered the government to affirmatively inform Ibrahim she was no longer on the No-Fly List because the government's Travel Redress Inquiry Plan—the only means by which an individual may challenge their suspected placement on the No-Fly List—failed to affirmatively disclose whether she had indeed been placed on the list incorrectly and whether she had been removed as a result.

The district court also granted unasked-for relief under our now-vacated precedent in *Din v. Kerry*, 718 F.3d 856, 863 (9th Cir. 2013), *vacated*, 135 S. Ct. 2128 (2015) by ordering the government to identify the specific subsection under section 212(a)(3)(B) of the Immigration and Nationality Act that rendered Ibrahim ineligible for a visa in 2009 and 2013. Lastly, on additional independent grounds, the district court granted further relief by finding that the consular officer who denied Ibrahim her visa erred in indicating she could not apply for a discretionary waiver of her ineligibility. The district court ordered the government to permit such a waiver application.

The district court did not reach the remainder of Ibrahim's other claims which included her First Amendment, substantive due process, equal protection, and Administrative Procedure Act claims because, in its view,

"even if successful, [they] would not lead to any greater relief than already ordered."

Thereafter, the parties and the court engaged in a lengthy and contentious fee dispute. In total, Ibrahim sought $3,630,057.50 in market-rate attorney's fees and $293,860.18 in expenses. Adopting the recommendations of a special master, the district court ultimately awarded Ibrahim $419,987.36 in fees and $34,768.71 in costs and expenses. Ibrahim challenges both the underlying legal framework the district court utilized to determine the fees she was eligible to recover, as well as the district court's adoption of various reductions applied to those eligible fees by the special master.

## II.

We begin with the district court's application of the EAJA.

Congress passed the EAJA "to eliminate for the average person the financial disincentive to challenge unreasonable governmental actions." *Jean*, 496 U.S. at 163. To that end, the EAJA permits a "prevailing party" to recover fees and other expenses from the government unless the government demonstrates that its position was "substantially justified."[3] 28 U.S.C. § 2412(d)(1)(A); *Thangaraja v. Gonzales*, 428 F.3d 870, 874 (9th Cir. 2005) (quoting *Gonzales v. Free Speech Coal.*, 408 F.3d 613, 618 (9th Cir. 2005)). The EAJA limits attorney's fees to "the prevailing market rates for the kind and quality of the services furnished" but, subject to

---

[3] The EAJA also provides for an exception where "special circumstances" would make a fee award to the prevailing party unjust. 28 U.S.C. § 2412(d)(1)(A).

exception, does not permit an award in excess of $125 per hour. 28 U.S.C. § 2412(d)(2)(A). One such exception to that cap applies where the court finds the government acted in bad faith. *Rodriguez v. United States*, 542 F.3d 704, 709 (9th Cir. 2008).

After determining Ibrahim was a prevailing party, the court below found that the government was substantially justified respecting its pre-*Ibrahim II* standing arguments, its defense against Ibrahim's visa-related claims, and its various privilege assertions. It disallowed fees associated with those issues. It found the government's conduct otherwise was not justified.

It further ruled that the government had not acted in bad faith, and with one exception not relevant here, imposed the EAJA's hourly cap to Ibrahim's fees.

Ibrahim contends these findings were erroneous. We address each in turn.

A.

We review a district court's substantial justification determination for abuse of discretion. *Gonzales*, 408 F.3d at 618. We review its interpretation of the EAJA de novo. *Edwards v. McMahon*, 834 F.2d 796, 801 (9th Cir. 1987).

The government's "position" when considered within the EAJA context includes both the government's litigation position as well as the "action or failure to act by the agency upon which the civil action is based." 28 U.S.C. § 2412(d)(1)(B). Hence, we have often articulated the substantial justification test as encompassing two lines of inquiry: one directed towards the government's original action, and the other towards the government's litigation

position defending that action. *See, e.g.*, *Gutierrez v. Barnhart*, 274 F.3d 1255, 1259 (9th Cir. 2001). But it remains true that the test is an inclusive one; it is the government's position "as a whole" that must have "a reasonable basis in fact and law." *Id.* at 1261.[4]

Citing our decisions in *Shafer v. Astrue*, 518 F.3d 1067, 1071 (9th Cir. 2008), and *Li v. Keisler*, 505 F.3d 913, 918 (9th Cir. 2007), the court below concluded "[t]he government must show that its position was substantially justified at each stage of the proceedings in order to avoid an award of EAJA fees." It went on to invoke our decision in *Corbin v. Apfel*, 149 F.3d 1051, 1053 (9th Cir. 1998), for the proposition that in exceedingly complex cases, a court may appropriately determine whether the government was substantially justified at each "stage" of the litigation and make a fee award apportioned to those separate determinations. It accordingly disallowed fees for discrete positions[5] taken by the government because, in its view, the government's positions in each instance were substantially justified. It was error to do so.

In *Jean*, 496 U.S. at 161–62, the Supreme Court broadly pronounced that the EAJA "favors treating a case as an

---

[4]  And though we have held generally that "a reasonable litigation position does not establish substantial justification in the face of a clearly unjustified underlying action," we have declined to adopt a per se rule foreclosing that possibility. *United States v. Marolf*, 277 F.3d 1156, 1163–64 and n.5 (9th Cir. 2002). We have likewise left open the possibility that reasonable underlying conduct may not be sufficient grounds to preclude a fee award in the face of otherwise unreasonable litigation tactics. *Id.*

[5]  As noted, these include the government's pre-*Ibrahim II* standing assertions, the government's defense of its revocation of Ibrahim's visa, as well as the government's privilege assertions.

inclusive whole, rather than as atomized line-items." Noting section 2412(d)(2)(D)'s use of the term "position" in the singular coupled with Congress's "emphasis on the underlying Government action," the Court concluded the EAJA substantial justification determination acted as a "one-time threshold for fee eligibility." *Id.* at 159–60 and n.7. Accordingly, the *Jean* Court rejected petitioners' argument that the court was required to make two substantial justification determinations: one as to respondents' fees for time and expenses incurred in applying for fees, and another as to fees in the litigation itself. *Id.* at 157.

*Jean*, then, we think is clear: courts are to make but one substantial justification determination on the case as a whole. That is not to say a court may not consider the government's success at various stages of the litigation when making that inquiry, but those separate points of focus must be made as individual inquiries collectively shedding light on the government's conduct on the whole, rather than as distinct stages considered in isolation. Indeed in *United States v. Rubin*, 97 F.3d 373, 375–76 (9th Cir. 1996), we affirmed a district court's treating the case as a whole in disallowing fees although there was some indication at least part of the government's conduct was not substantially justified. In doing so, we cited favorably to *Jean*'s recognition that the EAJA favors treating the case as an "inclusive whole." *Id.* at 375 (quoting *Jean*, 496 U.S. at 161–62).

We are aware our sister courts have adopted contrary views in this regard. The D.C. Circuit, for instance, has rejected a reading of *Jean* that would preclude a claim-by-claim determination on the ground that such a rule would render the EAJA a "virtual nullity" because government conduct is nearly always grouped with or part of some

greater, and presumably justified, action. *Air Trans. Ass'n v. F.A.A.*, 156 F.3d 1329, 1332 (D.C. Cir. 1998). In the same vein, the Seventh Circuit has cautioned against taking "judicial language out of context," reasoning that *Jean* "does not address the question whether allocation is permissible under the [EAJA]" to allow fees for the part of the government's case that was not substantially justified. *Gatimi v. Holder*, 606 F.3d 344, 350 (7th Cir. 2010).**⁶**

We do not share the fear, however, that a single-inquiry rule will render the EAJA "a virtual nullity." *Air Trans. Ass'n*, 156 F.3d at 1332. The possibility that an evaluation of the government's conduct can be so "'holistic,'" *id.*, so as to preclude a finding that the government was ever without substantial justification surely exists,**⁷** but such an application would run afoul of the basic principle that courts interpret and apply statutes "in light of the overall purpose and structure of the whole statutory scheme." *United States v. Neal*, 776 F.3d 645, 652 (9th Cir. 2015).

Nor are we concerned that a single-inquiry rule would disallow the recovery of fees even where the government may have been unjustified at certain stages or in discrete positions it took throughout the lifetime of the case. As the

---

**⁶** Some circuits, like the Third Circuit, have required district courts to "evaluate every significant argument made by an agency" in order to permit an appellate court "to review a district court's decision and determine whether, as a *whole*, the Government's position was substantially justified." *Hanover Potato Prods., Inc. v. Shalala*, 989 F.2d 123, 131 (3d Cir. 1993).

**⁷** Because, on a general level, almost all government action is carried out through authorized avenues pursuant to some legitimate purpose. Analyzed at that bird's-eye level, it is true that almost all government action is "usually substantially justified." *Air Trans. Ass'n*, 156 F.3d at 1332.

Supreme Court has noted, "substantially justified" in this context only requires justification "to a degree that could satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). That formulation implicitly permits the government some leeway, so long as its conduct on the whole remained justified. Whether those portions of the case on which the government was not substantially justified are sufficient to warrant fee shifting on the case as a whole is a question left to the evaluating court's discretion. But that a situation may arise where a court may deny a prevailing party fees even though the government was not substantially justified as to every position it took does not trouble us. Such a result seems expressly contemplated by the EAJA's use of the qualifying term "substantial" rather than "total" or "complete." 28 U.S.C. § 2412(d)(1)(A).

What's more, "[a]voiding an interpretation that ensures that the fee application will spawn a second litigation of significant dimension is central to Supreme Court jurisprudence on fee-shifting statutes." *Hardisty v. Astrue*, 592 F.3d 1072, 1078 (9th Cir. 2010) (internal punctuation omitted) (quoting *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791 (1989)). An approach permissive of separate substantial justification inquiries runs afoul of that interpretive paradigm.

Nor do we see any conflict with our decisions in *Corbin*, 149 F.3d at 1053, or its progeny in which we have upheld EAJA fee awards in the social security context where the award was apportioned to each successive stage of the litigation. As we noted in *Corbin*, following the Supreme Court's decision in *Shalala v. Schaefer*, 509 U.S. 292

(1993),**[8]** "it became possible for a [social security] claimant to be deemed a 'prevailing party' for EAJA purposes prior to the ultimate disposition of his disability claim." *Corbin*, 149 F.3d at 1053. As a result, we shifted focus from "considering only [whether the government was substantially justified as to] the ultimate issue of disability to considering the justification of the government's position at the discrete stage in question." *Id.* We have never applied *Corbin* outside of the social security context, nor do we see any reason to extend it to a case like this one where there was no possibility Ibrahim could be considered a prevailing party prior to the ultimate resolution of her claims.

In sum, courts assessing whether the government's position under the EAJA was substantially justified should engage in a single inquiry focused on the government's conduct in the case as a whole. We therefore hold the district court erred in disallowing fees relating to discrete litigation positions taken by the government.

---

**[8]** At issue in *Schaefer* was the point at which the EAJA's 30-day clock for a fee application begins to run following a successful social security appeal after the district court makes a sentence-four remand under 42 U.S.C. § 405(g) but fails to enter a final judgment. 509 U.S. at 294–95. The Supreme Court held that under such facts, the time for a fee application does not expire while the district court's order remains appealable, and in light of the absence of a final judgment, such orders remain appealable even through the remanded proceedings, therefore making a post-remand EAJA application timely. *Id.* at 303. The Supreme Court noted, however, that it was error for the district court to fail to enter a final judgment upon the sentence-four remand. *Id.* at 300–01. *Schaefer*'s upshot, therefore, was that sentence-four remands were to be accompanied by final judgments, which in turn, would require EAJA fee applications to be filed before the proceedings on remand were concluded.

B.

We next address Ibrahim's assertion that the district court erred in failing to find the government acted in bad faith and by consequently imposing the EAJA's hourly rate cap on the majority of her recoverable hours.**[9]**

The EAJA mandates that the "United States . . . be liable for such fees and expenses to the same extent that any other party would be liable under the common law." 28 U.S.C. § 2412(b). The common law permits a court to assess attorney's fees against a losing party that has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991). We hold the government to the same standard under the EAJA, *Rodriguez*, 542 F.3d at 709, and a finding that the government acted in bad faith permits a market-rate recovery of attorney's fees, *Brown v. Sullivan*, 916 F.2d 492, 495 (9th Cir. 1990).

"Under the common law, a finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *Rodriguez*, 542 F.3d at 709 (internal punctuation omitted) (internal quotation marks omitted) (quoting *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997)). "Mere recklessness does not alone constitute bad faith; rather, an award of attorney's fees is justified when reckless conduct is combined with an additional factor such as frivolousness, harassment, or an improper purpose." *Id.* (internal quotation marks omitted)

---

**[9]** The district court permitted an upward departure for attorney James McManis due to his distinctive knowledge and skills.

(quoting *Fink v. Gomez*, 239 F.3d 989, 993–94 (9th Cir. 2001)).

Ibrahim raises several arguments in support of her contention that the government acted in bad faith both in the conduct leading to and during this action. She first argues that the "Government's refusal to acknowledge and permanently correct the injustice to Ibrahim, and its apparent lack of concern that others may have suffered harm from similar errors, show bad faith from the inception of this case." Her next contention focuses on the government's raising of its standing defense after our decision in *Ibrahim II*, in which we held Ibrahim had Article III standing to pursue her claims. 669 F.3d at 994. She also claims the government's invocation of the state secrets privilege was made in bad faith and analogizes the government's conduct here with that in *Limone v. United States*, 815 F. Supp. 2d 393 (D. Mass. 2011). Ibrahim further alleges the government barred her and her daughter from entering the United States in an effort to prevent them from offering testimony at trial. And lastly, Ibrahim insists the district court clearly erred by failing to review the record in its entirety, and instead "examin[ed] examples of bad conduct in isolation and conclud[ed] each one individually did not show bad faith, rather than examining the totality of the circumstances."

We review the district court's bad faith findings for clear error. *Rodriguez*, 542 F.3d at 709. "A finding is clearly erroneous if it is '(1) 'illogical', (2) 'implausible', or (3) without 'support in inferences that may be drawn from the facts in the record.'"" *Crittenden v. Chappell*, 804 F.3d 998, 1012 (9th Cir. 2015) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)). "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, [an] appellate court[] must

constantly have in mind that their function is not to decide factual issues *de novo*," even where it is "convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74 (1985). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety," we must affirm. *Id.* We find that the district court's account of the evidence is plausible in the light of the record, and therefore affirm.

Respecting Ibrahim's first argument, it appears she is making two distinct claims: first, that the government wrongly placed her on its watchlists and therefore acted in bad faith, and second, that its defense of such placement was bad faith because it knew its conduct was wrongful. Both contentions are unavailing.

The district court found that at the time the government placed Ibrahim on its watchlists, including the No-Fly List, there existed "no uniform standard for [watchlist] nominations." It was not until after this suit was instituted that the government adopted the "reasonable suspicion" standard for placement on its watchlists. And although the government admits that Ibrahim did not meet that standard at the time of her placement, that fact alone is insufficient to reverse the district court here. The district court expressly declined to find that the government's initial interest in Ibrahim was due to her race, religion or ethnicity.[10] Absent evidence Ibrahim's inclusion on the watchlists was otherwise improper, it was not clearly erroneous for the district court to find the government's underlying placement of Ibrahim on its watchlists did not constitute bad faith.

---

[10] A finding Ibrahim does not challenge on appeal.

Nor was the government's defense of its partially mistaken placement bad faith. Prior to this suit no court had held a foreign national such as Ibrahim possessed any right to challenge their placement—mistaken or not—on the government's terrorism watchlists. It accordingly could not have been bad faith to assert, as the government did, that Ibrahim possessed no such right. And more importantly, it is not true that the government defended, as Ibrahim claims, its placing her on the No-Fly List. At the time this action was instituted in early 2006, the government had already removed Ibrahim from the No-Fly List more than a year prior, and, with one exception, the lists on which she did appear at that time were the same lists on which the nominating agent *had intended she be placed*.[11] Therefore, to the extent the government defended Ibrahim's placement on those lists, no colorable argument can be made such a defense was frivolous or made with improper purpose.[12]

---

[11] The district court found the nominating agent had intended to place Ibrahim within the Consular Lookout and Support System ("CLASS") List, the TSA Selectee List, the TUSCAN List, and the TACTICS List, but instead placed Ibrahim on the No-Fly List and the Interagency Border Information System ("IBIS") database. While the district court found the government removed Ibrahim from the No-Fly List in January 2005, it also found she remained on the Selectee List and CLASS Lists at that time. It found that in December 2005, she was removed from the Selectee List, but added to the TUSCAN List and TACTICS List. Thus, when this action was instituted, she was on the CLASS, TACTICS and TUSCAN Lists, which were, as the district court found, the same lists on which the nominating agent had intended she be placed. The district court made no finding, however, whether Ibrahim was ever removed from the IBIS database.

[12] That the government would later determine Ibrahim did not meet the reasonable suspicion standard, which was adopted subsequent to Ibrahim's nomination to the lists, and remove her from its watchlists is

The same can be said with respect to the government's raising of the standing defense after our decision in *Ibrahim II*. Ibrahim fails to point to any evidence indicating the government reraised standing as a defense at summary judgment and trial with vexatious purpose. What's more, the government correctly points out that there was at minimum a colorable argument that the different procedural phases of the case rendered their subsequent standing motions nonfrivolous.

Ibrahim's claim that the government's privilege assertions were made in bad faith is also unconvincing. As the district court noted, the government was successful on many of its privilege assertions, and on that basis it declined to find the government's invocation of privilege was frivolous. Ibrahim likens the government's conduct in this case with that in *Limone v. United States*, where a Massachusetts district court found the government had acted in bad faith by "block[ing] access to the relevant documents," and "hiding behind specious procedural arguments," which "culminat[ed] in a frivolous interlocutory appeal." 815 F. Supp. 2d at 398. The conduct in *Limone* included a refusal to disclose relevant information, even *in camera*, until ordered by the court to do so. *Id.* Ibrahim sees similar conduct in this case through the government's refusal to produce basic information without a court order, its objections to questions at depositions, and its objections to discussing publicly available information.

---

of no relevance. Ibrahim did not possess—nor did the district court find her to possess—a right to challenge the substantive basis for her placement on the government's watchlists. The district court's relief was explicitly limited to the government's post-deprivation procedural shortcomings and expressly disavowed "[a]ny other rule requiring reviewability before concrete adverse action."

But Ibrahim forgets that the government was ultimately successful on at least some of its privilege assertions, and absent evidence, of which Ibrahim has pointed to none, that the government's assertions on those unsuccessful occasions were frivolous or made with improper purpose, it could not have been clear error to decline to find the government acted in bad faith. Nor was the government's action here analogous to that in *Limone* where it had refused to grant its own lawyers access to the allegedly privileged documents which resulted in counsel's inability to respond to discovery motions and court orders for nearly two years. *See id.* at 398, 408. There is nothing similar in this case.

Nor is there any evidence in the record demonstrating the government prevented Ibrahim from entering the United States to offer testimony in this suit, and with respect to her daughter, Ibrahim fails to explain why there was any error in the district court's determination that the government's initial refusal to allow her into the country was anything but a mistake, and a quickly corrected one at that. The district court's findings here were not clearly erroneous.

Lastly, Ibrahim's argument that the district court erred by making piecemeal bad faith determinations is unpersuasive. Her sole authority on point is our decision in *McQuiston v. Marsh*, 707 F.2d 1082, 1086 (9th Cir. 1983), *superseded by statute as recognized by Melkonyan v. Sullivan*, 501 U.S. 89, 96 (1991), where we made the unremarkable observation that "[b]ad faith may be found either in the action that led to the lawsuit or in the conduct of the litigation." She fails, however, to point to any case where we have elevated that observation to edict. Rather, we have consistently required fee awards based on bad faith to be "traceable" to the conduct in question. *See, e.g.*, *Rodriguez*, 542 F.3d at 713. It was therefore proper for the

district court to consider each claimed instance of bad faith in order to determine whether the associated fees should be subject to a market-rate increase.

III.

We turn to the district court's fee reductions imposed in accordance with the Supreme Court's decision in *Hensley*, 461 U.S. 424.

Though a prevailing party may be eligible for fees under the EAJA,[13] "[i]t remains for the district court to determine what fee is 'reasonable.'" *Id.* at 433. And as the Supreme Court noted, and we have often repeated, "the most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Schwarz v. Sec. of Health & Human Servs.*, 73 F.3d 895, 901 (9th Cir. 1995) (internal punctuation omitted) (quoting *Hensley*, 461 U.S. at 433). In the case of fees sought under the EAJA, the "reasonable hourly rate" is capped by the EAJA itself. 28 U.S.C. § 2412(d)(2)(A). Thus, the equation for determining the reasonable amount of fees awardable in cases such as this is the number of hours reasonably expended multiplied by the applicable EAJA rates. The resulting figure—the lodestar figure—forms the basis for the remainder of the *Hensley* determination.

---

[13] Though *Hensley* addressed fees in the context of the Civil Rights Attorney's Fees Act of 1976, 42 U.S.C. § 1988, the Court went on to hold in *Jean* that the assessment of reasonable fees under the EAJA is "essentially the same." 496 U.S. at 160–61. We have since applied *Hensley* to EAJA fee awards. *See, e.g.*, *Atkins v. Apfel*, 154 F.3d 986, 989–90 (9th Cir. 1998).

But where a plaintiff has only achieved limited success, not all hours expended on the litigation are eligible for inclusion in the lodestar, and even those that are eligible may be subject to a discretionary reduction. *Hensley*, 461 U.S. at 436; *Schwarz*, 73 F.3d at 901. Thus, under *Hensley* we have required district courts to follow a two-step process where a plaintiff's success is limited: first, the court must determine whether the claims upon which the plaintiff prevailed are related to the unsuccessful claims. *Webb v. Sloan*, 330 F.3d 1158, 1168 (9th Cir. 2003). That inquiry rests on whether the "related claims involve a common core of facts *or* are based on related legal theories." *Id.* Time spent on unsuccessful claims the court deems related are to be included in the lodestar, while "[h]ours expended on unrelated, unsuccessful claims should not be included" to the extent those hours can be "isolated." *Id.* at 1168, 1169. Thus, in addition to time reasonably spent on successful claims, potentially recoverable under *Hensley* are those hours expended on related but unsuccessful claims as well as those hours pertaining to unrelated, unsuccessful claims that cannot be severed cleanly from the whole.

Second, a court must consider "whether 'the plaintiff achieved a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award.'" *Sorenson*, 239 F.3d at 1147 (internal punctuation omitted) (quoting *Hensley*, 461 U.S. at 434).[14] Here, "a district court 'should focus on the significance of the overall relief

---

[14] If the district court finds that a plaintiff was wholly successful, it must still evaluate whether the degree of success obtained justifies an award based on the number of hours reasonably expended, whereas a "limited success" finding necessitates the intermediary step of determining which claims were related or unrelated before weighing the degree of success obtained against the total number of hours reasonably expended.

obtained by the plaintiff in relation to the hours reasonably expended on the litigation.'" *Id.* (quoting *Hensley*, 461 U.S. at 435).

If the court concludes the prevailing party achieved "excellent results," it may permit a full fee award—that is, the entirety of those hours reasonably expended on both the prevailing and unsuccessful but related claims. *Hensley*, 461 U.S. at 435; *Schwarz*, 73 F.3d at 905–06. On the other hand, where a plaintiff has not achieved results warranting a fully recoverable fee, the district court may apply a downward adjustment to the lodestar by "award[ing] only that amount of fees that is reasonable in relation to the results obtained."[15] *Hensley*, 461 U.S. at 440.

Ibrahim was successful below on her procedural due process claim. The district court, however, expressly refused to reach her remaining claims—which included her substantive due process, equal protection, First Amendment, and Administrative Procedure Act claims because "those arguments, even if successful, would not lead to any greater relief than already ordered." It accordingly treated those claims as having been unsuccessful.

It awarded full fees and expenses for those hours Ibrahim's counsel incurred litigating her procedural due process claim. Because it found that her unsuccessful substantive due process and Administrative Procedure Act claims were related to her successful claim, it also awarded fees and expenses incurred prosecuting those claims. It declined to make any award for those fees and expenses

---

[15] It is at this step for instance that district courts apply a reduction for the inclusion of hours associated with unrelated, unsuccessful claims that could not be easily segregated. *Webb*, 330 F.3d at 1169.

associated with Ibrahim's First Amendment and equal protection claims because they "were not related to the procedural due process claim (for which [Ibrahim] received relief) because they involve different evidence, different theories, and arose from a different alleged course of conduct."

Ibrahim attacks the district court's *Hensley* reductions on two grounds: first, she contends it was error to conclude her First Amendment and equal protection claims were unrelated to her successful procedural due process claim. Second, she argues the "excellent results" she obtained in this litigation support a fully compensable fee. We reject both assertions.

We review a district court's award of fees under *Hensley* for abuse of discretion, including its ruling that a party achieved only limited success, *Thomas v. City of Tacoma*, 410 F.3d 644, 649 (9th Cir. 2005), as well as its finding that unsuccessful claims are unrelated to the claims upon which a plaintiff prevailed, *Schwarz*, 73 F.3d at 902. Unrelated claims are those that are both factually *and* legally distinct. *Webb*, 330 F.3d at 1168. In *Schwarz*, we observed "the test [for the factual relatedness of claims] is whether relief sought on the unsuccessful claim is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief [is] granted." 73 F.3d at 903 (internal quotation marks omitted) (quoting *Thorne v. City of El Segundo*, 802 F.2d 1131, 1141 (9th Cir. 1986)). Thus, "the focus is to be on whether the unsuccessful and successful claims arose out of the same course of conduct," or as the Supreme Court put it: the same "common core." *Id.* (internal quotation marks omitted); *Hensley*, 461 U.S. at 435. "If they didn't, they are unrelated." *Schwarz*, 73 F.3d at 903.

The test does not require that the facts underlying the claims be identical. The concept of a "common core" or "common course of conduct" is permissive of the incidental factual differences underlying distinct legal theories. Were that not the case, rare would be the occasion where legally distinct claims would qualify as related under *Hensley*. But it remains true that the work done on the unsuccessful claims must have contributed to the ultimate result achieved. *Hensley*, 461 U.S. at 435; *Schwarz*, 73 F.3d at 904.

The court below disallowed fees for Ibrahim's First Amendment and equal protection claims because they were based on different legal theories, evidence, and "alleged" courses of conduct. Ibrahim contends that reasoning was erroneous and in support cites *Webb*, 330 F.3d 1158, where we addressed an EAJA fee award arising out of a suit for false arrest, malicious prosecution, and false imprisonment. There we found that the "common course of conduct" was the plaintiff's "arrest, detention, and prosecution." *Id.* at 1169. In light of that formulation, we noted that the plaintiff's unsuccessful false arrest claim was "unquestionably" related to his successful false imprisonment and malicious prosecution claims because they each sprang from that same underlying conduct. *Id.* We therefore concluded that work done on the plaintiff's unsuccessful false imprisonment claim "could have contributed to the final result achieved" and accordingly treated such work as being related for *Hensley* purposes. *Id.*

What Ibrahim misses—and what distinguishes this case from *Webb*—is the mutually exclusive nature of the claims presented here. As a predicate to the *Webb* plaintiff's false imprisonment claim, the plaintiff had to be arrested. Work done investigating and developing the factual record on the false arrest claim would therefore necessarily further the

plaintiff's successful false imprisonment claim. Likewise, the plaintiff's malicious prosecution claim was inextricably tied to the prosecutor's state of mind in bringing the spurious charges, which in turn was heavily reliant on what the prosecutor knew about the circumstances surrounding plaintiff's arrest. Most work attributable to the plaintiff's false arrest claim, therefore, likely also contributed to the plaintiff's successful claims.

The same cannot be said for Ibrahim's claims. In light of the district court's findings, Ibrahim's First Amendment and equal protections claims were mutually exclusive with her procedural due process claims. That is, if the government negligently placed Ibrahim on its watchlists because it failed to properly fill out a form, then it could not at the same time have intentionally placed Ibrahim on the list based on constitutionally protected attributes Ibrahim possesses, and vice versa.[16] These mental states are mutually exclusive. Therefore, it was not an abuse of discretion to find that Ibrahim's unsuccessful claims were unrelated, because although the work done on those claims could have contributed to her ultimately successful claim, the facts and legal theories underlying Ibrahim's claims make that result unlikely.

We note our prior decisions in this sphere are somewhat opaque. In *Schwarz*, we detailed our previous decisions' shifting focus on the degree to which the unsuccessful and successful claims arose out of the same common course of conduct and the degree to which the work done on unsuccessful claims contributed to the results achieved.

---

[16] The district court expressly declined to find that the government's initial interest in Ibrahim was due to her nationality or her religious beliefs. Ibrahim does not challenge that conclusion before this Court.

73 F.3d at 903 (citing *Thorne*, 802 F.2d at 1141; *Outdoor Sys., Inc. v. City of Mesa*, 997 F.2d 604, 619 (9th Cir. 1993); *Herrington v. Cty. of Sonoma*, 883 F.2d 739, 747 (9th Cir. 1989); *Cabrales v. Cty. of Los Angeles*, 935 F.2d 1050, 1052 (9th Cir. 1991); and *O'Neal v. City of Seattle*, 66 F.3d 1064, 1068–69 (9th Cir. 1995)). Ultimately in *Schwarz*, we affirmed the district court's decision to reduce the lodestar for work done on unsuccessful claims both because the sets of claims there were both factually and legally dissimilar and because the efforts spent on the unsuccessful claims did not contribute to the plaintiff's success. *Id.* at 904. Nevertheless in *Webb*, we characterized our decision in *Schwarz* as "reaffirm[ing] that the focus is on whether the claims arose out of a common course of conduct." 330 F.3d at 1169. Here, Ibrahim's First Amendment and equal protection claims were based on her allegations that the government intentionally put her name on the lists based on constitutionally protected attributes, while her procedural due process claims were based on her allegations that the government failed to provide adequate procedures to remove her name from its lists. Accordingly, the district court did not err in concluding that these claims were based on both different alleged courses of conduct and different legal theories. Further, in light of our decisions on the matter, we likewise believe it cannot be error for a district court to also consider—as the court below did—that efforts on unsuccessful claims did not contribute to the success obtained.

In addition, even if it were the case that Ibrahim's unsuccessful claims arose out of the same factual context as her successful claim, it is not true that the work expended on those claims necessarily contributed to her ultimate success. We therefore decline to find the district court abused its

discretion by concluding Ibrahim was ineligible to recover fees for work on those claims.

We also reject Ibrahim's second contention that the "excellent results" she obtained should entitle her to a fully compensatory fee. The district court permitted Ibrahim to recover fully for her Administrative Procedure Act and substantive due process claims because, though unsuccessful, they were related to her procedural due process claim. However, in doing so, it made no explicit mention of "excellent results," though such a recovery by necessity implies an "excellent results" finding. *See Schwarz*, 73 F.3d at 905–06. And in light of our affirmance of the district court's ruling with respect to Ibrahim's First Amendment and equal protection claims, a ruling that Ibrahim also obtained excellent results on two of her four claims would have no effect on her potentially recoverable fee award.

We find unconvincing, however, the government's contention that the district court's overall fee reduction—including its EAJA reductions—should be affirmed because the district court could have imposed such a reduction under *Hensley*'s second step. The government claims that any errors contained in the district court's EAJA application and relatedness findings is harmless. The government, however, forgets that although the district court enjoys substantial discretion in fixing an appropriate fee under *Hensley*, we have imposed the modest requirement that it "explain how it came up with the amount." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008). "The explanation need not be elaborate, but it must be comprehensible . . . [T]he explanation must be concise but *clear*." *Id.* (internal quotation marks omitted) (quoting *Hensley*, 461 U.S. at 437). Where the difference between the fee award requested

and the fee award granted is negligible, "a somewhat cursory explanation will suffice," but where the disparity is greater, "a more specific articulation of the court's reasoning is expected." *Id.* Whatever the actual basis for the district court's reductions here, there is certainly no room for argument that it clearly and concisely explained that its reductions to Ibrahim's fee award were justified in light of the success she obtained. Absent such an explanation from the district court, we cannot take a rough justice approach and sua sponte decide that the district court's mistaken fee reductions would be equivalent to the fee reductions it would have made at *Hensley*'s second step.

## IV.

Following its fee entitlement determination, the district court appointed a special master to fix Ibrahim's fee award.[17] The special master went on to recommend a number of discretionary reductions to Ibrahim's fee request due to block-billing, vagueness, and lack of billing judgment. The special master also made reductions for failure to demonstrate that the work claimed was associated with recoverable claims or issues. The district court adopted these reductions. It also struck Ibrahim's objections to the special master's report and recommendation on expenses for failure to follow page limits.

Because the reductions recommended by the special master and adopted by the district court were largely rooted in the district court's EAJA determination, we agree with Ibrahim that those findings should be revisited if the district court once more determines Ibrahim is entitled to fees.

---

[17] Though Ibrahim objected to the special master's appointment, she does not press that issue on appeal.

Ibrahim's contention that the district court abused its discretion in striking her objections to the special master's report and recommendation on expenses, however, is unavailing.

In its order appointing the special master, the district court also ordered the special master to file a report and recommendation regarding fees and expenses, and imposed a ten-page limit on the parties' objections to that report and recommendation. It further required each party to file an appendix of all relevant communication with the special master.

The special master, however, filed two reports and recommendations, one focusing on fees and the other on expenses. In response, Ibrahim filed a ten-page set of objections to each, along with a one-page "statement."

The district court struck Ibrahim's objections to the special master's report and recommendation on expenses for having filed "two ten-page briefs, a 234-page declaration with exhibits, and a one-page 'statement,'" without also moving for a page extension. It found her filings were not good faith attempts to abide by its orders.

On appeal Ibrahim argues it was improper to strike her objections because the special master filed two reports and recommendations, and, therefore, it was reasonable to file a ten-page set of objections to each.[18] She alternatively argues

---

[18] Ibrahim also argues that the district court's striking of her expenses resulted only in those objections being "overruled." That assertion is patently contradicted by the record. In its order striking Ibrahim's objections, the district court stated: "No objections to the special master's report regarding expenses are preserved because counsel failed to abide by the rules."

that the district court's imposition of a ten-page limit on objections to reports and recommendations totaling hundreds of pages was also an abuse of discretion.

District courts have the inherent power to strike items from their docket for litigation conduct. *Ready Transp., Inc. v. AAR Mfg., Inc.*, 627 F.3d 402, 404 (9th Cir. 2010) (citing *Hernandez v. City of El Monte*, 138 F.3d 393, 398 (9th Cir. 1998)). We review the exercise of that power for abuse of discretion and the factual determinations underpinning such exercise for clear error. *Id.* at 404; *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 367 (9th Cir. 1992).

Here, it was not clearly erroneous to conclude Ibrahim failed to abide by the district court's page limits. While it is true that the special master filed two reports and recommendations and the district court's order might have been misinterpreted or misunderstood by plaintiff's counsel, it is also true that the order stated "all objections" should not exceed ten pages. Thus, whether the special master filed a single or several reports and recommendations, the district court's order imposed a ten-page limit on objections. Indeed, the government restricted its objections to ten pages. We therefore cannot find that it was clearly erroneous to conclude Ibrahim failed to abide by the district court's page restrictions.

Nor do we see the striking of Ibrahim's objections in response to that failure as being an abuse of discretion. The order in question also required Ibrahim to resubmit her fee request and imposed requirements on that resubmission in order to facilitate the district court's efforts to fix her award.

Ibrahim obstinately refused to abide by those requirements, and instead, filed multiple motions to

reconsider the district court's fee entitlement determinations.**[19]** In light of Ibrahim's repeated failures to follow *the very same order*, we cannot conclude the district court abused its discretion by striking her objections to the special mater's report on expenses.

Finally, we refuse to address Ibrahim's contention that it was an abuse of discretion to limit her objections to ten pages. Where a party believes a district court has issued an improper order, their remedy is to raise that issue on appeal. *United States v. Galin*, 222 F.3d 1123, 1127 (9th Cir. 2000). In the meantime, however, they are to either abide by the order, file an interlocutory appeal, if available, or move for reconsideration. *Id.* Ibrahim did none of those things. Rather, she simply exceeded the district court's page limits while "objecting" to those selfsame limits in a footnote. A party will not be heard to complain of an order on appeal by which it failed to abide. We therefore do not reach the merits of Ibrahim's claim here.

## V.

Any fee dispute is tedious, and this one is no exception. Though we are reluctant to require the district court to revisit its findings in this already protracted satellite litigation, we

---

**[19]** Ibrahim offered multiple rationales for her refusal to follow the district court's order that she resubmit her fee request. Initially, she argued that counsel had previously been awarded fees based on similar billing records. She also argued she would be unable to categorize projects in the manner directed by the district court because "that is not the way the time was recorded or billed." At oral argument, however, she argued she could not comply with the district court's order because it was predicated on legally erroneous conclusions. We find none of these rationales persuasive because Ibrahim, in the end, failed to comport with the order.

see no other alternative. We pause to note, however, that we offer no view on the appropriateness of the amount already awarded by the district court in this case. It may well be Ibrahim is entitled to substantially more or substantially less than that amount. But until an amount is fixed in accordance with applicable law, we are unable to pass upon that question.

The present panel will retain responsibility for any appeals that may possibly emanate from an appealable order or judgment of the district court resulting from this remand. The fee and expense awards of the district court are **AFFIRMED in part**, **REVERSED in part**, and **REMANDED** for proceedings consistent with this opinion.